Thank you, Judge Lee. Raymond Moss for Dante Hunt, the appellant, and may it please the Court. There are multiple independent grounds for vacature of the judgment below. I plan to focus on the three lead issues in the reply brief, the two sentencing issues, excuse me, the two suppression issues, and the recusal issue. If the Court agrees with Mr. Hunt on these issues, the Court would not need to reach the sentencing or the Bruin issues, but I'm happy to take questions there as well. The District Court erred, both as a factual and legal matter, when it concluded that at the time of the seizure, the objective facts available to the Eugene Police indicated that they had a phone with no known owner and that it had been voluntarily abandoned. That finding was primarily based upon the argument accepted by the District Court that the Eugene Police believed the white iPhone that Mr. Hunt had at the hospital that was seized from him was the phone that was on the surveillance camera that they reviewed at the scene of the crime because they couldn't tell the color of the phone from the surveillance camera itself. That just doesn't make good sense when Mr. Hunt is seen on camera being shot at by the assailant, the assailant flees off camera away from Mr. Hunt, he falls to the ground off camera, and the phone is then found a few feet from where Mr. Hunt had fallen. Counsel, could I ask you a question? If we agree with you that the abandonment doctrine has no application here, then what? Then the court needs to decide whether the 25-month delay between the initial seizure by the Eugene Police and the federal government's ultimate search of the cell phone was an unreasonable delay in time. How would it be unreasonable? I'm sorry, Your Honor, can you repeat that? What's your best argument that it would have been unreasonable? Well, it's a balancing inquiry, and the government has put forth no argument as to why the Eugene Police, when they seized the phone and kept it for 25 months, had an interest in holding onto that phone. Well, wasn't the phone part of a crime scene? I mean, there was someone had been shot. It was seized at the crime scene, so you're not arguing the seizure itself was unconstitutional, but rather the time it was kept. I don't think the court has to reach whether the initial seizure was unconstitutional. We do make the point in the brief that there was no probable cause for the seizure, and the government, the Eugene Police specifically, never searched for the phone. But the court has not – But they found the phone within, as you just argued, within a few feet of where this person had been shot, and they took it into custody because it potentially could have been evidence of a crime, which was, as I understand it, still an open crime two years later, and it was in evidence in that crime. So is that really an unreasonable amount of time to hold potential evidence from a crime scene? So I think there are a couple sort of assumptions built into Your Honor's question. The first is that the phone is somehow connected or could lead to evidence connecting the shooter to the act that they were investigating, which was an assault of Mr. Hunt. Mr. Hunt was a victim of the crime. That's not disputed by anybody. So holding onto a phone that there's really good indication was Mr. Hunt's. You know, the government itself, the federal government, when it applied for a search warrant over two years later, had to have probable cause to search the phone. And in their search warrant, they said it was found a few feet from where Mr. Hunt fell, which was consistent with him dropping it. So, you know, the fact that the government says that the Eugene Police wasn't clear to them whose phone it belonged to, one, there was no Eugene officer at the suppression hearing to testify to that. This is purely the federal government vouching for what was clear to the Eugene Police. But the Eugene Police, when they talked to him, he had two phones, so they may have assumed the white iPhone they found with him at the hospital was his phone. The black iPhone, they weren't sure whose it was, but it was near the crime scene. They kept it. They didn't know who it belonged to. So, I mean, it seems to make sense they would just hold onto it. Well, if they believed that it would have led to evidence to support their investigation, then they would have applied for a search warrant. And the government doesn't argue that they, in fact, did that. They just held onto a phone. It appears they held onto it for the exact reason why we're here. They believed it was connected to Mr. Hunt, and it eventually would have been relevant to a investigation. But you're not challenging the initial, I think as Judge Ben-Shavanko just clarified, it's at the crime scene. You're not arguing that it was unlawful for them to collect it at that time, right? Once you get past that, it seems to me you would have to be telling us there was some intervening event that would put them in a position where it was something they thought was evidence, may have evidence of a crime. So, if this is not a... This part of your argument strikes me as really tough. Yeah, so, I mean, I think there are other doctrines that could apply here. The government has not made these arguments, right? So, if the officers came across a cell phone and in a, let's say it was at a restaurant, and they collect it trying to try to find out who the owner is, right? You might have, in that instance, a community caretaking type of exception applying. Here, arguably, an inventory type exception applies. But under this Court's precedent, most recently in an en banc decision in Anderson from a term or two ago, the Court said that you have to look at the reasonableness of the seizure against the governing regulations for the police. So, we cite in our reply brief both the local Eugene Code and the Eugene Police Manual that says that when you come across lost property or abandoned property, there's an obligation to provide notice. But you've already argued this wasn't abandoned. He dropped it when he was shot. And I don't think, and I think that you're, that I'm in tendency here to find that the Court misapplied the abandonment theory in this case. Abandonment requires some state of mind that you intended to give something up. And I don't think that Mr. Hunt was in a state of mind at that moment to be giving anything up intentionally. He lost what ultimately proved to be his phone. But you got 13 minutes and a lot of other topics. So, I'm inclined to ask you to move on to something else. Can I just address one thing, Your Honor, before moving on? I think Your Honor's point sort of proves why the abandonment exception just doesn't apply here as a matter of law. We're not pushing back on that. Counsel, we're not pushing back on that. Oh, okay. All right. So, you know, just turning on, just turning to the Franks issue and the second sort of suppression issue here. This issue is really straightforward. The first search warrant that the Portland Police Bureau, which was working in a joint investigation with federal authorities, both applied for and received, was a July 5th search warrant for a cell phone ending 5114. That cell phone. Counsel, you've briefed this really carefully and we've read your, and you've done an excellent job. So, if we could cut to the chase here. I think you're challenging, and you have good reason to challenge the geolocation warrants, right, because there's information missing from that first warrant application that would have impeached the confidential, the first confidential informant, right? That's what we're getting to? Right. Right. So, can I ask you to move to, if I agree with you about that, and I'm just one out of three, but if I, I think you have gained some traction there. What about the second confidential informant? Why wasn't that adequate support for the premises warrant? Absolutely, Your Honor. So, there are a few reasons. One, you have a second informant making a first appearance in the most relevant search warrant applications that the federal government applied for, which was the premises warrants. That individual did not appear in any of the, I believe, five previous search warrants, including one filed four days before by the federal government. That's right. Yeah. And the agent that was applying for the premises warrant is the same agent that was repeatedly misleading the court throughout this entire process, Mr. McAllister. So, that alone should give this court pause as to accepting that representation in the affidavit. But the government also relies on. Wait a minute. Accepting what representation? That confidential source number two was not connected to confidential source number one? Or is there some other representation? Yeah. So, both of that, Your Honor. But also, part of the reason there was corroboration between the second informant and the first is reference to the 5114 phone number. So, that piece of connected evidence comes directly from the July 5th search warrant. The court doesn't need to get into sort of. Wait a minute. All confidential informants. The first one didn't identify Hunt by name. Only 5114. But the second one does both, right? 5114 and Hunt by name.   I have it in my notes. So, why isn't that enough? So, that's food for the poisonous tree. The government, through using the July 5th search warrant, was able to connect Mr. Hunt to the 5114 phone. Without that evidence, you would only have a. No. I'm inviting you to set aside everything that flowed from the first warrant. That's what I'm inviting you to do. And then asking why confidential informant number two isn't sufficient for that premises warrant. Because at that time, if you sort of zoom in to that, right? And it seems that they know who Mr. Hunt is because he was released from prison for prior drug charges. They know he was the subject of this shooting that we talked about, right? They know that confidential informant number two has identified he's dealing drugs. I guess that would be consistent with his prior course of dealings. His driver's license identified the Deacon Street house, the premises at the ER159, identifies 2843 Deacon Street as his residence. Why isn't that, what I just summarized, enough for that second, for the premises warrant? I understand, Your Honor. But it is the identification of Mr. Hunt through, there are two aspects to this answer. So, the identification of Mr. Hunt through the July 5th warrant steered an investigation. The government represented multiple times in search warrant affidavits that they were stretched thin with their resources, they needed to be able to identify who the user of these phones were in order to be able to inform their use of limited resources in multiple parallel investigations. So, the identification of Mr. Hunt and then subsequent identification of his ID, things of that nature, that would all flow, be fruit of the poisonous tree flowing from the July 5th search warrant. So, and the other sort of categories of evidence, there's sort of three broad categories the government points to in the premises search warrant, by itself do not rise to the level of a fair probability of both guns and drugs being in the Deacon residence. So, you have Walmart transfers that have no, that the government says come from no legitimate source. The government's only. That's, I think, I put that in the first category because that's the fruit of, I think, the geolocation warrant. I would agree with you, Your Honor. So, we're really left. I'm still trying to give you the stuff that I think they have that's not fruit. I'm not, I'm trying to ask you why wouldn't that have been enough? Yeah, I think a single representation by one informant that is based upon a affidavit sworn to the court by an agent that has repeatedly lied over the past three months, or excuse me, misled the court over the previous three months, just leads to a really problematic finding that a agent could mislead a court repeatedly and then say, oh, I have a second search, I have a second, excuse me, informant, saying the same thing the first one did. I should get the search warrant. Do you have anything to offer that that second informant isn't, wasn't real or was somehow, I mean, you're, it's like implying like they made up a second person. And to the question as to the first person, does it count at all that it corroborates to some extent that person's testimony about, they identified a phone number that they were dealing with when that person was arrested with the overdose issue and the 5114 number, which was in the phone contemporaneous to these discussions, whether or not this person didn't just make up, oh, Mr. Hunt, I know Mr. Hunt, it's Mr. Hunt. There was evidence that actually corroborated that this was the person that, this phone number was the person that that conformant was communicating with. So how, what would have happened in this Frank's hearing? I mean, really, would it have really changed anything because this wasn't someone who just came in and said, oh, I know a guy and he's the guy who's doing this. And you can just trust me. There was some actual physical evidence that corroborated what was represented to the court. So your honor, I guess two points, just one, the corroborating evidence is not as strong as, sort of your question suggests. In her phone records, A.H.'s phone records, there was indication that she was getting pills from multiple people. And that was exactly what she said to the police when she was being interviewed after being arrested. So there are conflicting representations. This is an individual with a 12-page long rap sheet, including lying to the police to set up other people. But the phone number was in there at the relevant time when the transactions that led to this person who overdosed happened. So why would they not have looked at who that phone number belonged to? Why is that so, like, far-fetched that they would have traced that phone to Mr. Hunt at some point anyway?  So the inquiry to get at Frank's hearing here is, and by the way, the government is not disputing that the two prongs for Frank's have been satisfied. They're just arguing that there's sufficient independent evidence to justify the premises warrants. But the inquiry is whether there was intentional or reckless disregard of leaving certain information out. Ms. Hill's long rap sheet, and this is settled law in this Court, that that type of information not being given to a magistrate judge that undermines the credibility of your sole source, that by itself distinguishes any potential probable cause. So the fact that there is sort of this thread of corroboration, when you also have other evidence showing that she lied repeatedly throughout the interview and there were other people she was getting drugs from, that just wouldn't rise to the level of probable cause under the second prong of Frank's. You mentioned the agent had repeatedly lied or misled the Court. One is obviously what you're pointing out to, omitting the convictions for lying to the police. What are the other things that the agent misled the Court on? Well, I mean, not including the information. So it's on the information.  And then, frankly, when it was disclosed, the informant's criminal history was disclosed, it was done so in a footnote on the 16th page of a 27-page search warrant affidavit in the last sentence of the footnote. So rather than actually inform the Court of the mistake, it was just buried deep into the search warrant affidavit. I mean, those things are always in a footnote. I mean, I'm a district judge. I was a magistrate judge. I mean, they're not the lead paragraph for an informant. They're a footnote to an informant's history. I mean, I think given the number of search warrants, geolocation warrants here that are incredibly invasive of privacy, and the fact that such a meaningful amount of information that undermines their sole informant's credibility was left out, that's something that should have been brought to the Court's attention, you know, at the forefront. I agree with you. It should have been brought to the Court's attention. Absolutely. So I just want to make sure that I'm understanding your response, counsel, clearly, as to why the second informant wasn't enough. And what I'm hearing you saying is that it was fishy, that she showed up right only at the September 25th level, and the Court should have looked at that with a more jaundiced eye. Did I miss something in your response? I think that's right. I think I would just caveat that with, on these facts, if the Court were to sort of find that that was sufficient evidence for probable cause here, it would lead to this rule where an agent could repeatedly leave material information out of multiple search warrants and then later on sort of make this representation to get out of a Franks hearing. This is something that should go back to a Franks hearing. If it was, in fact, the case that there was a second informant, there can be an in-camera review of that, and the Court can also actually take the testimony of Mr. McAllister, who, by the way, in his affidavit, could not even provide a reason why he failed to include Ms. Hill's information in these search warrants. That's something for the Court to make a credibility determination on at a Franks hearing. That's not something to be affirmed and sort of create a new rule to sort of circumvent a Franks hearing on these facts. I'm going to get to the accusation. Yes. Thank you, Your Honor. So the government relies very heavily on United States v. Silver, and there were three primary facts in that case that gave the Court comfort that there was not an appearance of partiality. One is the U.S. attorney had ceased being the U.S. attorney five years before the indictment. The second is that the U.S. attorney was not involved in the conviction itself. And the third fact is that at the sentencing hearing before the judge who, you know, had become a — subsequently become a judge, the Federal Government did not put before that judge anything that required the judge to make a determination about the earlier sentence, and the earlier case, for that matter. All three of those facts and more are present here. You have the judge in this case being the U.S. attorney when two subsequent indictments were — two superseding indictments were filed, including adding multiple charges to the case. You had the U.S. attorney being present through the sentence. And you had, at the sentencing hearing below, the same AUSA arguing to his former boss that the earlier sentence, a 20-year sentence that was secured, should be the benchmark against which the Court measures the current sentence. Those facts as a whole are problematic, but they are even more problematic given that the President of the United States commuted that sentence, that 20-year sentence, after 13 years purportedly because it just was not a just sentence in his view. So using a 20-year sentence as a benchmark here really raises the appearance of, in the words of Sir Williams, the Supreme Court's case, that a judge would be psychologically wedded to the judge's former position as a prosecutor now that they're a judge. So — I know there's some language saying, you know, AUSA's conduct can be imputed to the supervisor, the U.S. attorney. But here, I mean, again, she was the U.S. attorney. She probably oversaw literally hundreds of drug cases. You know, realistically, would she remember a particular drug case? I mean, this is not something factually unique. I mean, this is probably a dime a dozen here. So Your Honor's right. Arne Pricer, this Court's opinion, imputes the knowledge and acts of AUSA's to the U.S. attorney himself or herself. But actual knowledge or actual bias is not something that's relevant to the  Supreme Court. The Supreme Court said unlikely that it is the appearance of partiality, the appearance of bias, that is the most relevant thing here. So given that those acts of line agents are imputed to the U.S. attorney herself, it would raise for the normal person on the street, you know, maybe not you or I, but the normal person on the street, would question whether or not there is the level of impartiality that's required of a Federal judge, particularly at sentencing where there's a very, very broad amount of discretion given to judges. Even if the U.S. attorney came in and argued that the previous sentence that the defendant had received was not sufficient to deter him from criminal conduct, the guideline range here was well over 200 months in this case. No matter how you calculate it, if you calculate it based on a 38 as the offense level at a criminal history Category 2 or a 36, if you use 30 as the base offense level, you're still at a criminal history. You're over 200 months. So how is that? I mean, all judges look at someone's prior criminal history. It's part of the 3553A factors you've got to look at. So the fact that she would have been aware and that the prosecutor would have argued his previous sentencing and criminal history, how does that make it a bias? I mean, it's a factor. Well, it sounds like Your Honor is sort of pointing out that this could be sort of harmless error given the size of the sentence to some extent. This Court said in Steele and Culp that even two criminal history points, excuse me, two points in the calculus that leads, you know, in that case led to a couple year difference in the guidelines range. That's material enough for there to be a vacature and a remand. Here, part of the concern, and this touches on the sentencing issues as well, is that the Court found that Mr. Hunt was an armed career criminal under the ACCA. That carries heavy sentencing weight. Right. But she sentenced him under a criminal history Category 2, regardless of having found that he qualified under the ACCA. She applied a guideline range that was at the criminal history Category 2, which was his properly calculated criminal history. I think — I'm not sure it's as clear as Your Honor is saying, but she also made findings about sort of the drug quantity as well, right? So treating every single pill seized, when only about 90 pills were seized and tested, and there were about 2,800 pills that were untested, and there was no evidence sort of connecting those pills to the ones that were tested that had an A215 or an E8 on them. All of those things, I think, would really raise concerns for a normal person on the street as to the partiality — excuse me, the impartiality of a judge. Thank you. Mr. Christin, do you have any more questions? Nothing further. Thank you. Great. Thank you. I know we asked you a lot of questions, so time's up, but we'll give you two minutes for rebuttal. May it please the Court. Suzanne Miles for the United States. Here with me also is AUSA Sarah Barr. If the Court has any questions on the Bruin issue, she's here to handle those, although we don't have any affirmative argument on that unless the Court needs to hear anything. With regard to the issues that my opponent argued, to be honest with you, I think that the Court's questions show a mastery of the record that I'm not sure I can add anything to. So unless Your Honors have questions, I don't want to take your time on issues that have already been fully briefed. Well, I mean, this is a significant question. I mean, assuming, and I think we're all on the same page right now, that the abandonment issue was misapplied here. Not that abandonment can't ever be applied to a phone or the digital content of a phone, but in the facts of this case, it seems there was no intent on the part of Mr. Hunt to give away his phone and everything that was in it. It was locked. It was all those things. But it was seized at a crime scene, and their primary argument, I think, is it was Mr. Hunt's phone and give him the opportunity to reclaim it. Nobody did that. They held on to it for a little over two years, and then the federal government had an indication this phone could be connected to a different investigation, got a warrant, and seized it. So what's your response on the timeframe? So I think a couple of things, and I would like to touch on the abandonment issue, but I'm going to leave that for the end. With regard to the timeframe itself, this conflates the actions of the Eugene Police Department, which was investigating a shooting, and the federal drug investigation, which was completely independent from the Eugene Police Department. So the question with regard to Eugene is whether they seized that phone lawfully, whether they had a reason to hold it. And here they seized it as part of a shooting investigation. They held it into evidence. They kept it in evidence for a little bit under two years at that point. And what the court found, and remember, these are factual findings that this court is to review for clear error. Judge Emmergat looked at these facts, and what she determined was that the defendant was, in fact, on notice that Eugene Police Department likely had that phone. He had enough information to put him effectively on notice, and he never sought its return. He never sought the return of the black iPhone, nor did he seek the return of the white iPhone. Excuse me, counsel. What evidence is there that he knew they had that phone? So what the court relied on, Your Honor, is the conversation that happened at the hospital. So when the police went and saw Mr. Hunt at the hospital, they let him know that they were investigating the crime scene. He was aware that they were taking his white iPhone as potential evidence of that crime. He was the defense counsel actually at that hearing stated that Mr. Hunt knew the Eugene police officer who spoke to him. He was aware that it was Eugene police and actually recognized the officer. He was aware that his keys had been recovered from the crime scene, from where they had been dropped, and those keys were ultimately returned to an associate of his. And he was also aware that other evidence had been taken from his girlfriend after dropping him off at the hospital. So he was well on notice that Eugene was investigating the shooting, that he was identified as a victim. That's quite different than knowing they've got his black cell phone, and they gave him a receipt for the white cell phone. So I don't see that this is supported very well. Is there something missing? In order for him to abandon, he has to be aware that they've got it. And I don't see anything that persuaded me that he was aware that they had the black phone. Your Honor, the standard is preponderance of the evidence. And again, this court reviews the district court's factual findings for clear error. So putting those things together, Judge Immergitt looked at those surrounding facts and didn't find beyond a reasonable doubt for sure that Mr. Hunt knew absolutely that Eugene police had his black iPhone. But what she said was that the circumstances were enough that he could at least infer that if he was missing this black iPhone that he had at the time that he was shot, it was likely that Eugene police had picked it up along with all of the other evidence that they had picked up at that crime scene. That if he had dropped it and it no longer was there, certainly somebody else may have picked it up. But by a preponderance, he was at least on notice that if he was looking for it, he could go to Eugene police and ask if they had it. And neither he nor any of his associates ever did that. I need to shift gears, please. I'm interested in the first geolocation warrant had some omitted information that strikes me as quite pertinent because it would have impeached the witness. But I've been focusing in my questions on the second confidential informant. And when we get to that part, the briefing kind of goes back and sweeps in. When I say that point, I mean the point of what would they know, right, just from the second confidential informant? And they certainly would have known about Judge Hunt or Mr. Hunt's history. And they would have known about the shooting. And then they have this second confidential informant indicating that he's dealing drugs. And as I indicated in my earlier question, his driver's license connects him to the Deakin street house. So just looking at that premises warrant alone, I think the briefing sweeps in, the government briefing sweeps in knowledge of the Wal-Mart transactions. And that strikes me as problematic, very problematic, because I think the only thing I can see in the record that led the government to the Wal-Mart transactions is the geolocation warrants. But there is a declaration that's a little bit cryptic from an IRS agent that starts with, so he's got those transactions in hand. We can't tell how he got them. Can you connect those dots?  So this investigation was a dual effort by the IRS and by FBI and Portland police. And so the IRS agent was independently looking, not independently, they were cooperative, but the IRS agent was essentially chasing the money. And so it was the IRS piece of this investigation that looked into these money transfers. How does the IRS get onto Hunt's trail? The first location warrant said 5114. It didn't have Hunt's name in it, as you know. And that number was registered to a woman, a completely different person, not Hunt. It wasn't until the second interview with the first informant that they were able to show a photo, and then she identified. So you can see the fruits argument, as you know very well. So I'm just trying to figure out, if we're focusing just on confidential informant number two, and what goes into that basket of, what did the government know at that point? It's not fruit. I'm trying to figure out whether the Walmart transactions are fairly included, and I don't see how they would be. Can you help me with that? I can help you by pointing you to Judge Mossman's, the transcript of Judge Mossman's hearing at ER 15 through 23, where he has a conversation with the U.S. attorney about what is independent source. And when he lists out those items that are entirely independent from the first CI, he does list the Walmart transfers among those as not being dedicated or being contrived from the, derived from the geolocation. I know that. I've got that. I've read that. I'm trying to figure out why he reached that conclusion. I'm sure you know the record very, very well. What record evidence is there to support that conclusion, that the Walmart transactions were independent and not fruits? Well, Your Honor, I'm not quite sure how to answer that question. I think, in part, I'm trying to prove a negative. What I can tell you is that the investigation into the financial transactions came about because of a focus on Mr. Hunt, not because of the geolocation. Where he was at any given time didn't have that. We didn't get Mr. Hunt to any of this until, right, not from the first CI. That just told you about a phone number. And I was tracking that phone number, I think, that led you pretty clearly to Mr. Hunt. That's opposing counsel's point, right? Yes. Opposing counsel's point. And, of course, we take very seriously if something is omitted intentionally or otherwise from that first warrant, and by the way, from the second warrant. But I do think that the government has this second CI that I don't see any reason to question the government's representation that that CI was independent from the first CI, right? It just doesn't get me. And I indicated in my earlier questions, you know, itemized the evidence that I think was fairly considered that it is independent, but I struggled to see how the Walmart evidence was. Your Honor, I'm not sure that I can satisfy you here at oral argument, but what I would be happy to do is file essentially a 28-J that provides you with record citations if I can get you a more concrete hook. Can you address one of the sentencing issues in particular, the whether ORS 475.922 is a predicate offense for serious drug offense, in particular given our decision in Sandoval? Yes. So, Your Honor, this court is not bound by Sandoval when looking at whether Oregon DCS qualifies under the ACC. So Sandoval dealt with essentially the Controlled Substances Act. It got there through, you know— But those two statutes kind of relate to each other, right? They don't. So under Sandoval, what we were looking at is whether Oregon DCS would be a categorical element-to-element match with the Controlled Substances Act and the drug offenses that are tied in that. And what the court looked at was the text of the Controlled Substances Act, and it looked and said that when defining delivery, the CSA includes conspiracy and attempt as inchoate forms of delivery. And because it does not explicitly include solicitation, the inchoate crime of solicitation, the CSA, because it doesn't include it, must exclude it because it includes other inchoate crimes and does not include that one. And so when looking under an elements test, the CSA and Oregon's delivery statute are not an element-to-element match. What we're looking at here under the ACC is a much broader test that Shuler clarified for us. We're not looking at a comparison to the elements of any particular federal crime. The question that the court is asking is, when we look at the elements of Oregon's crime, Oregon DCS, does that crime necessarily entail drug distribution conduct? Well, I think we're asking, wouldn't you agree, counsel, asking whether it necessarily required manufacturing, distributing, or possessing with the intent to distribute? Yes. So what we're asking is whether it necessarily involves manufacturing or distribution conduct. What Shuler said explicitly in looking at the ACCA was, does it include the type of conduct that is included in manufacturing, distributing, or possessing with the intent to do either of those two actions? So the question is, does this necessarily entail distribution conduct? And that requires the court... Last thing you said is what I would push back on. Sure. I think it's a categorical analysis in Shuler. We're not looking... Absolutely, it's a categorical analysis. We're just not looking at a generic offense, and the Supreme Court tells us we're looking involved with what that means, and it means necessarily includes. So that's how I get to the statute, the Oregon statute, and asking whether we have to ask ourselves whether that statute necessarily includes manufacturing, distributing, or possessing with intent to distribute. And I think right there, that intersection comes, so you're going broader, and that may be where we're... Because up until then, I think we're on the same page. But at that point, you're looking more broadly at whether the statute included conduct. It still has to be necessarily required, right? It has to necessarily involve, for our purposes, not manufacturing. That's not what's involved here. The question is whether it necessarily involves distribution conduct. So conduct involved in distribution, and that's what Shuler says specifically, is we're looking not at specific names, but distribution includes. States call it different things, to sell, to broker, to deliver, to do a whole bunch. It gives a whole bunch of different ways that states encompass this. And then we turn to this Court's decisions in Ahumada and in McElmurry about how this Court defines distribution conduct. And what this Court has said in both of those cases is that we define distribution conduct to include the different stages of distribution, from the brokerage all the way to the completed delivery. And that's also what the Court in Penn, in the Eleventh Circuit, it's what the Court in Prentiss, in the Fifth Circuit, also said. How do we unsee that Oregon allows this particular conviction, this particular statute, for mere solicitation? So solicitation, we can call it solicitation. When they were looking at that, they're talking in part about the inchoate crime. What they were really looking at was brokerage conduct, brokering of a drug deal, setting it up, deciding how much, how it was going to be delivered, who was going to deliver it, who was going to pay, and knowing that the defendant was going to benefit from that deal. And so that is very similar. Couldn't solicitation be a lot less than that, just saying you want to buy some drugs? So what we're looking at, though, is what is the scope of Oregon's drug delivery law? And our lowest common denominator in that is not solicitation writ large. It's the conduct that happened in the Stealth case. That is where we look at what Oregon decides is enough. And there, what they were asking not is this solicitation as meets the elements of the inchoate crime solicitation. I'm sorry, I'm over time. Do you mind if I finish? Go ahead. Thank you. What they were asking was, was this conduct enough to constitute a substantial step and qualify as an attempted delivery? That's what they were asking. And so that conduct, some other offer for sale, might not have been enough. But what they said there was where the defendant took all of these steps to broker a drug deal, that counts as delivery under Oregon law, and that counts as drug distribution under the other circuits who have looked at this. I want to just follow up, though, on this question, specific to this case, because this is relevant to the sentencing guidelines and the calculation of the sentencing guidelines. My reading of the transcript from the sentencing hearing was very clear that the judge calculated, both under a criminal history Category 6 and a criminal history Category 2, rejected the guidelines at the criminal history Category 6, which would have been as a result of applying the ACCA, said that was too high, and then actually sentenced the defendant to a midpoint in the guidelines under a criminal career history Category 2. So where's the harm? Even if it was error to consider it and say it was applicable, where's the harm? There is none. And you're right, Your Honor, that's at ER 124. It's very clear that the court applied a criminal history Category 2. The reason that this is here in this posture is that the question of DCS and whether it qualifies as an ACC has been in the thorn in the side of the district courts in Oregon for quite some time from Sandoval, and this was the way to get it in front of the Ninth Circuit. Okay. And I know that you're over time, but if the rest of the panel indulge me, I'm very curious about the method for the drug quantity approximation here. You have 92 seized pills. They were not consistent in the amount of drugs of analog within them. The court was required to make an approximation that erred on the side of caution. You are one pill over in this quantity that was assumed to get to a 300-gram to a 1-kilogram guideline range starting at a 32 instead of a 100. It was 300.09 kilograms of fentanyl analog based on the math that the court applied to the number that was presented by the government. Given that these ranges were largely hypothetical, is that really erring in the side of caution to come in at one pill, hypothetical pill of 2,766 unseized pills to say we're going to go up to a level 32? So, Your Honor, I'm not certain about the one pill. I don't necessarily – Oh, I did the math. Okay. If you take the – you started at 0.105 grams as the lowest amount, which again was a guess because there was testimony that some of these pills might have just been fake with nothing, and then estimated out an unseized pill quantity of 2,766 pills, and that comes out at 300.09 grams. One less pill would have had you at 299.9 whatever, but below the 300. Is that a caution on the side of being as conservative when you're estimating to just creep over the line? I think that the district court did the math differently. Certainly, we had 92 seized pills. Only four of those were tested. Some of them were carfentanil, the elephant tranquilizer. Some of them were furanol fentanyl. What we had was 92 seized pills, but we also had testimony from Riley Jones about 2,000 more pills. We had testimony from P.R. Supsang about 200 more pills. We had specific testimony from A.H. about 120 additional pills, and that took the court to 2,412 pills of which there was direct evidence in the record at trial, leaving 400 pills by the conservative estimate that was unaccounted for. And so what the court did then was looked at the evidence that there were pills that had been flushed at the Deakin residence, so she relied on that, the fact that the defendant hid in the bathroom for about 12 minutes when the search warrant was being executed and there was residue on the rim, there was residue in a bag, there were pills found around the toilet. She relied on additional testimony from P.R. Supsang at S.E.R. 256 that she had seen the defendant with a bag of hundreds of pills. Again, these are very broad estimates, hundreds. You don't know how many were flushed, and the difference here in the guideline range really turns on one pill. It's true that she did an estimate, and so the question becomes whether the testimony that she relied on, and it's not at this point we're talking about testimony regarding there's at least one other witness who talked about hundreds of pills, but then we also had these text messages about transactions, and there we have 200, 100, 100. I only have 89, even though you said you sold me 100. And so all of that combined is how the district court looked to see that there was at least another 400 pills that hadn't been accounted for, and that's in addition to the unexplained wealth, which the court did put a thumb on the scale for that, saying she couldn't attribute that directly to drug trafficking. The defendant was also involved in other illegal activities, but that that supported, to Your Honor's point about whether this was conservative or not, she used that unexplained wealth to say that if we're erring not on the side of going down, but in fact going up, that unexplained wealth helps to support that. All right, thank you. You're welcome. Thank you. Judge Christin, do you have any more questions? Nothing else. Thank you, Judge Lee. Thank you, Your Honors. Thank you. Just very briefly, three points, one on the abandonment, one on the Armed Career Criminal Act issue, and then one about the drug quantity finding. So this is not, this doesn't come to the forefront in the briefing, but I think it's really relevant to the Court's consideration of the abandonment issue. The finding of abandonment here was based on two primary facts that repeat itself millions of times a year. Somebody, in this case police officers, came across a phone with no known owner, and there was physical separation between the owner and the device. It is really troubling if, moving forward, any individual lacks the ability to challenge a search of that device and the use of their digital data in perpetuity. That includes the type of conduct that the Court had before it in the Olson case. It is really troubling conduct. We're not asking, based on the abandonment doctrine, not applying that argument, that every single instance of a phone being seized without a warrant is, you know, per se unconstitutional suppress. We're just saying people retain their reasonable expectation of privacy in their data, which is unbelievably intimate to themselves, and just as a quantity matter, unlike anything you can see in the physical world. To say nothing about the use of the cloud to be able to actually retain your data and abandon the physical device, but not the data itself. On the ACCA issue, the government in its briefing, and again, in argument, has said the test is distribution conduct. That is a broader test, and that is not what Shuler says. The test under Shuler is necessarily entails, and then the statute says distribution. That is a narrower test than the government has represented repeatedly, and the problem ultimately is there's no limiting principle to the government's argument. The statute, the ACCA, says that only serious drug offenses qualify under the Armed Criminal Act, but under their theory, every type of conduct, no matter how tenuous, to the actual act of distribution would get swept in. So this case, the court's case, it was set in the brief in Davis, an unpublished case, is one where you have accomplice liability under the Idaho statute, but the substantive crime actually has to be committed. So that would be an example of there actually is a substantive distribution taking place, but the individual involved with it isn't the one actually doing it. So, you know, our position is not that, you know, anyways, the government's position is just sort of overstated. And very briefly, the drug quantity findings, I see I'm briefly over here. Can I just briefly conclude? Thank you. The drug quantity findings by the district court were based on testimony that spanned all throughout 2017 into 2018. The charged period was November of 2017 to I believe it was October of 2018. So even the estimates of the number of pills was not a conservative estimate because the people testifying as to the number of pills they distributed could not say when in that very broad period the pills were actually distributed. I have nothing else if the court has any further questions. Great. Thank you. Thank you. Thank you both for a very helpful oral argument. We are adjourned for the day and the case is submitted. Thank you. All rise.
judges: CHRISTEN, LEE, Bencivengo